## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SEI GLOBAL SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> SS&C ADVENT and SS&C TECHNOLOGIES HOLDINGS, INC., <br><br> Defendants. | No. 20-CV-1148 (CFK) <br><br> JURY TRIAL DEMANDED |

### FIRST AMENDED COMPLAINT

Plaintiff SEI Global Services, Inc. ("SEI"), by and through its attorneys Holland & Knight LLP, files this complaint against Defendants SS&C Advent ("Advent") and SS&C Technologies Holdings, Inc. ("SS&C") (collectively, "Defendants"), stating as follows:

### INTRODUCTION

1.      SEI is a provider of outsourced portfolio accounting (and related administrative) services to investment managers and hedge funds, a business in which it competes with SS&C. SEI uses accounting software licensed from Advent in connection with its provision of portfolio accounting services to its clients.

2.      SEI had no issues or disputes with Advent from the inception of the contract between the parties in 2000 until the end of 2019. This dispute followed the acquisition of Advent by SS&C, a direct competitor of SEI, in 2015. Between 2015 and 2019, peace between the companies still existed. However, SS&C decided to flex its muscles in the fall of 2019 by raising

a series of disingenuous positions to gain an advantage over SEI, leaving SEI no choice but to file this lawsuit to protect itself.

3.    Over the course of several months, SS&C has tried to extort SEI by claiming that it could terminate or not renew the license agreements for several important software products.

4.    The central Software License and Support Agreement was executed on September 9, 2000 (the "Software Agreement" or the "Agreement" attached hereto as Exhibit A).  Over the years, Advent and SEI entered into Order Schedules to the Agreement whereby SEI licensed various software products, including Geneva, Moxy and APX.

5.    In addition, SEI and Black Diamond, a wholly-owned subsidiary of Advent, also negotiated and entered into a separate license agreement for Black Diamond services on or about December 31, 2014 (the "Black Diamond Agreement").  *See* Master Subscription Agreement between Black Diamond and SEI, attached hereto as Exhibit Q.

6.    With one very limited exception, which is inapplicable to the present contractual relationship between SEI and Advent, these agreements renew automatically unless SEI elects not to renew them, or if one of the parties terminates pursuant to the termination provision.

7.    The Agreement has been subsequently amended by the parties but has not been terminated.

8.    The Agreement and its amendments cover a series of license keys from Advent that deliver critical data and portfolio accounting processing functionality to SEI.  The license keys provided by Advent to SEI dictate which components/capabilities SEI is able to use within the Advent software.  The functionality provided by Advent's software is viewed as standard in the industry and can only be delivered through contracting with Defendants.

9.      For example, Geneva is investment accounting software.  SEI utilizes Geneva to calculate the value of fund portfolios that their clients manage.  A fund portfolio can take the form of a pooled vehicle or a separate account.  The license keys for Geneva control what investment accounting capabilities SEI is able to utilize within the Geneva software.

10.     Among other things, SEI sells its investment manager clients investment accounting services for all asset classes.  Advent's Geneva software performs this accounting and the results serve as the investment managers' official books and records.  Fund portfolios are processed daily on Geneva.  Trades are processed, dividend and interest accruals are calculated, income is paid, costs are amortized, securities are priced per client defined hierarchies, corporate actions are processed, and portfolio performance is calculated – all on Geneva.

11.     Investment managers make decisions based upon their portfolio accounting records.  Advent's Moxy application is a portfolio and trade order management system.  SEI has integrated Moxy with Geneva to provide SEI's investment manager clients with unique benefits.

12.     Consistent with its CEO's public statements and strategy to "take over the world" through an aggressive acquisition campaign, in 2015, SS&C acquired Advent and, by doing so, now (with Advent) owns Advent's software and the ability to control its licensing.  *See* SS&C enjoys success but wants billions more; Windsor software behemoth eyes new acquisitions, expansion abroad, Hartford Business Journal, March 21, 2011, https://www.hartfordbusiness.com/article/ssc-enjoys-success-but-wants-billions-more-windsor-software-behemoth-eyes-new-acquisitions.

13.     SS&C, SEI's direct competitor, touted the competitive edge that the acquisition of "a leading provider of mission-critical software, including Geneva, APX, and Moxy" would provide, including how its "acquisition of Advent further deepens SS&C's penetration with the

global investment management community" and how its acquisition of Advent would address "pent up demand for a holistic solution from a single provider."  *See* SS&C February 2015 Investor Presentation,                SS&C                Acquisition                of                Advent, https://s22.q4cdn.com/211474323/files/doc_presentations/2015.2.2_Arbor_Investor_Presentation _vF_02feb2015.PDF.

14.    SS&C was not bashful about the benefits of owning this "mission critical" software, stating:  "We … now own the means of production for our service level that we really jealously guard … because that's the bedrock of everything we do.  And for 50 years, our marketing mantra has been we use our own software and with Advent Geneva we have 2,400 employees that use Advent Geneva every day, so it's nice as now we have 2,400 people that [use] SS&C Geneva every day."  *See* SS&C July 30, 2015 Q2 Earnings Call, https://seekingalpha.com/article/3373805-ss-and-c-technologies-ssnc-ceo-bill-stone-on-q2-2015-results-earnings-call-transcript.

15.    Since this acquisition, SS&C dominates, controls, manages, and operates Advent, to such an extent that, at all times since its acquisition, there existed a unity of interest between SS&C and Advent and complete ownership of Advent by SS&C.  Advent is SS&C's alter ego. SS&C is using its alter ego as an instrumentality or conduit to accomplish its own anticompetitive objectives.

16.    Now that SS&C owns Advent, Defendants are attempting to unilaterally and improperly revoke the license keys to which SEI is entitled under the Agreement, in violation of the terms of the Agreement.  This improper termination will cause substantial harm to SEI's business.

17.    Other investment accounting systems exist in the marketplace, but SEI would need substantial time to research other systems, select a replacement, contract with another vendor, and

convert its business from the Advent-provided software to an alternative software. This process would take years, would necessarily disrupt SEI's business, and would carry substantial risk and uncertainty because the effort might not be successful.

18.     Even if SEI were to successfully switch to other portfolio accounting software, doing so would likely come at a significant competitive cost to SEI because many investment managers have a strong preference for using Advent software and will only work with providers of outsourced portfolio accounting services that have access to Advent's products.

19.     Without access to the Advent data and portfolio accounting processing functionality, SEI's services would be so materially diminished that it could not meaningfully compete and would be irreparably harmed.

20.     For example, if SEI's utilization of Geneva were disrupted **even for one single day**, the impact to the business of SEI's clients would be immediate and devastating. SEI's clients rely on the portfolio accounting data generated by Geneva to make investment decisions and to evaluate the effectiveness of their investment strategies. Without accurate books and records, investment managers simply cannot perform their services or fulfill their obligations to their customers.

21.     Realizing the significant business impact that would accompany an abrupt termination of the Software Agreement, the parties agreed to a three year wind-down period during which Advent would continue to provide the software to SEI.

22.     SEI has tried to negotiate with Defendants in good faith, but Defendants have refused to heed the terms of the Agreements, giving SEI no choice but to file this lawsuit to protect its business.

## PARTIES AND JURISDICTION

23.     Plaintiff SEI Global Services, Inc. is a Delaware corporation with its principal place of business at 1 Freedom Valley Drive, Oaks, Pennsylvania.  SEI provides a broad range of investment management services to clients, including customized investment solutions, an enterprise operating platform, wealth management, and IT services.

24.     Defendant SS&C Advent is a Delaware corporation with its principal place of business at 600 Townsend Street, San Francisco, California.  Advent was founded in 1983 and was purchased by SS&C and renamed SS&C Advent on or around July 8, 2015.

25.     Defendant SS&C Technologies Holdings, Inc. is a Delaware corporation with its principal place of business at 80 Lamberton Road, Windsor, Connecticut.

26.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a).

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claims herein occurred in this District and SEI is a citizen and may be found in this District.

## FACTS

28.     SEI and Advent entered into the Agreement on September 9, 2000.  *See* Agreement, Exhibit A.  The Agreement provides that: "This Agreement and each license granted hereunder, unless otherwise agreed, will remain in effect perpetually unless and until terminated by mutual agreement of the parties or as set forth below."  Agreement at Section 10.1, Exhibit A.  The Agreement further provides that: "Licensee [SEI] may terminate this Agreement or any license at any time.  Advent will have the right to terminate this Agreement or a particular license if Licensee fails to perform any material obligation under this Agreement (including the obligation to pay

amounts due hereunder) and fails to cure such nonperformance within thirty (30) days following written notice of such failure."  Agreement at Section 10.2, Exhibit A.

29.     The Agreement was first amended on October 27, 2005 to modify the definition of "Software" to include specific third party software.  *See* Amendment to Software License and Support Agreement, attached as Exhibit B.  The amendment did not change the termination provisions.

30.     The parties then executed Order Schedule 17 on January 20, 2009, addressing the licenses for the Geneva and Moxy software and providing that SEI has a perpetual license to this software unless SEI decides not to renew.  Order Schedule 17 at Section B, attached hereto as Exhibit C.

31.     Regarding termination, Order Schedule 17 states:

Notwithstanding Section 10.2 of the Agreement, neither party shall have the right to terminate any term license under the Agreement except (a) Licensee may terminate the Agreement in the event Advent fails to perform a material obligation under the Agreement and fails to cure such breach within thirty (30) days following written notice of such failure, and (b) Advent may terminate the Agreement in the event **Licensee fails to perform a material obligation** under the Agreement **and fails to cure such breach within thirty (30) days following written notice of such failure**.

Order Schedule 17 at Section H.2, Exhibit C (emphasis added).

32.     Order Schedule 17 also created the protection of a three-year "Wind-Down Period" if the license was not renewed or terminated.  Order Schedule 17 at Section B, Exhibit C.

33.     On December 15, 2010, the parties entered into Order Schedule 21, which provides the license for additional APX software.  Order Schedule 21, attached hereto as Exhibit O.

34.     When the parties negotiated Order Schedule 21, Advent tried to obtain its own right to not renew the license for APX, proposing in negotiations that "either" party would have the right to not renew the license.  Draft of Order Schedule 21, attached hereto as Exhibit P.  SEI did

not agree with Advent's attempt to create a bilateral right of non-renewal, and the parties ultimately agreed that only SEI, as the Licensee, would have the right to not renew the license for APX at the end of any term.  Order Schedule 21, attached hereto as Exhibit O.

35.    Under Order Schedule 21, Advent was obligated to continue to license the APX software to SEI for as long as SEI continued to renew the contract, unless Advent decided that it would cease supporting the software for any customers.  But even under that narrow and specific provision, Advent could not end the contract without providing notice to SEI at least six months prior to the end of the term.  *See* Order Schedule 21, Section B, attached hereto as Exhibit O.

36.    Amendment Number Two to the Agreement was negotiated and executed in conjunction with Order Schedule 21.  Amendment Number Two, attached hereto as Exhibit D.

37.    In Amendment Number Two the parties revised the termination provision under the Agreement and limited the parties' ability to terminate, while preserving the pre-existing non-renewal rights.  Amendment Number Two states:

> Notwithstanding Section 10 of the Agreement, neither party shall have the right to terminate any term license, (i.e. a license that has a set end date) under the Agreement during such term, except (a) Licensee may terminate the Agreement in the event Advent fails to perform a material obligation under the Agreement and fails to cure such breach with thirty (30) days following written notice of such failure, and (b) Advent may terminate the Agreement in the event Licensee fails to perform a material obligation under the Agreement and fails to cure such breach within thirty (30) days following written notice of such failure.  Nothing herein shall be interpreted as limiting a party's right to not renew a term license.

Amendment Number Two at ¶ 5, attached hereto as Exhibit D.

38.    Under the Agreement and its amendments, SEI maintained its unfettered and unilateral right to decide not to renew for any reason.  Advent's sole right not renew arose only under the APX license in Order Schedule 21, and was conditioned on a decision by Advent to stop supporting the software and the provision of six months' notice.

39.     Amendment Number Two also changed the governing law of the Agreement to New York law.  Amendment Number Two at ¶ 14, attached hereto as Exhibit D.[1]

40.     On or about December 31, 2014, SEI and Advent entered into the Black Diamond Agreement.  Exhibit Q.  Consistent with the Software Agreement, the Black Diamond Agreement granted only to SEI, the "Client," the right to not renew the license.  *See* Black Diamond Agreement Data Sheet, attached hereto as Exhibit R.  Both parties can terminate for cause upon written notice and an opportunity to cure.  The Black Diamond Agreement also provides SEI with Transition Assistance Protection of nine months "upon the expiration or termination of the agreement for any reason."

41.     The parties executed another amendment to the original Agreement, also labeled Amendment Number Two, on January 28, 2015.  This Amendment Number Two added Section 11.12 to the Agreement, which provided SEI with something the parties deemed "Termination Assistance."  "If the term of this Agreement or any Order Schedule is not renewed or is terminated by Licensee, Advent shall, upon Licensee's written request, continue to make Software under such a non-renewed or terminated Order Schedule available to Licensee and shall provide transitional assistance to Licensee to the extent reasonably requested by Licensee to facilitate Licensee's smooth migration from the Software to software or other systems developed by the Customer and/or a replacement supplier in accordance with the following terms . . ."  Amendment Number Two, attached hereto as Exhibit E.

42.     Amendment Number Two also extended the duration of Transition Services for a period "up to thirty-six (36) months following such non-renewal or termination of the Agreement or Order Schedule, as applicable, and Advent shall continue to provide the Software under such

---

[1] Amendment One to Order Schedule 17 remains under California law.  Amendment One to Order Schedule 17 at ¶ 9, attached hereto as Exhibit F.

Order Schedule (as requested by Licensee) during that thirty-six (36) month period in accordance with its obligations under the Agreement, subject to the Licensee continuing to pay Advent the applicable license fees…"  Amendment Number Two, attached hereto as Exhibit E.

43.    Amendment Number One to Order Schedule 17 was executed on January 30, 2015 and also provided for a three year Wind Down Period during which SEI would continue to use the software after non-renewal or termination.  *See* Amendment Number One to Order Schedule 17 at Section B, attached hereto as Exhibit F.

44.    Amendment Number Two to Order Schedule 17 was executed later that year, on December 29, 2015.  This Amendment modified the Annual Fee stated in Order Schedule 17, as modified.  *See* Amendment Number Two to Order Schedule 17, attached hereto as Exhibit G.

45.    That data and portfolio accounting processing functionality is only provided to SEI upon the entering of license keys each year to unlock the software.  For example, Order Schedule 17 provides that "[a]t least 30 days before the end of the then-current Term (a) if Licensee extends its term license for a Wind-Down Period as set forth below or (b) if the Term of this Order Schedule 17 is automatically renewed pursuant to the following paragraph, Advent shall properly deliver the software keys that will allow Licensee to use the Software for such additional time period." Order Schedule 17 at Section B, attached hereto as Exhibit C.[2]

46.    SEI utilized Advent's products without incident or interruption from 2000 to the fall of 2019, including for the four years since SS&C purchased Advent in July 2015.  For SEI, Advent, and SS&C, the relationship was a stable, successful, and profitable one.  During this time,

---

[2] SEI's prior code expired on January 20, 2020.  Defendants provided a temporary, 30-day key to SEI to permit continued data processing until February 19, 2020 and thereafter provided a year-long key, extending SEI's ability to use the software until January 20, 2021.

SEI's customers and thus SEI's business depended on the functionality provided by Advent's software for their day to day activities, and SEI and Defendants worked together without dispute.

47.     This dispute regarding the Agreement only arose recently.  On October 31, 2019, Robert Roley, a Senior Vice President at Advent, sent an unexpected letter to SEI on "SS&C Advent" letterhead.  *See* October 31, 2019 SS&C/Advent Letter, attached hereto as Exhibit H. This letter stated, *inter alia*:

> You are hereby notified that unless Advent and SEI are able to reach mutually satisfactory terms for a renewal of the below-listed software products and services (the "Products"), Advent is unwilling to renew or extend the present term for such Products. Therefore and for the avoidance of doubt, you are hereby notified that Advent hereby elects not to renew any of the Products upon the expiration of their current terms.

48.     The products that Defendant listed in the letter included Geneva, Moxy, APX, Advent Custodial data services, and Black Diamond Services.  *See* October 31, 2019 SS&C/Advent Letter, attached hereto as Exhibit H.

49.     Despite the fact that only SEI has the right to terminate the Agreement unless there is a material breach and opportunity to cure, Advent and SS&C did not assert or otherwise imply that SEI had breached the agreement.

50.     The timing of SS&C's power play is conspicuous.  On the next day, November 1, 2019, SS&C publicly stated on its earnings call that it expected to accelerate growth of its organic core business to "over 6% in Q4."  When asked how it was going to accomplish such robust growth, SS&C admitted that it was "going through our entire client base … about prices increases and making sure that . . . we can maximize our opportunity in our current client base…."  *See* SS&C November 1, 2019 Q3 Earnings Call, *available at* https://seekingalpha.com/article/4301301-ss-and-c-technologies-holdings-inc-ssnc-ceo-bill-stone-on-q3-2019-results-earnings-call.

51.   In several follow up calls, letters, and emails, it became clear that Defendants would say anything in an effort to increase their prices, bully SEI to gain unfair competitive advantages, and meet their promises to Wall Street.

52.   On November 12 and November 18, 2019, SEI and Defendants participated in conference calls where SEI inquired about, and the parties discussed, the basis for Defendants' purported right to terminate.  During those discussions, Defendants backed away from a purported right to not renew the licenses but suggested for the first time that some "public policy" may prevent enforcement of the Agreement.

53.   SEI rejected the conclusion that the Agreement was invalid under public policy and was confused by Defendants' argument.  In fact, Defendants' position on perpetual licenses is inconsistent with their own public filings.  In SS&C's Annual Report, Form 10-K, filed on March 1, 2019, Defendants publicly touted the role that perpetual software licenses play in its success, stating: "[w]e also generate revenues by licensing our software to clients through either perpetual or term licenses and by selling maintenance services."

54.   On November 18, 2019, James Warren, Managing Director at SEI, responded to Advent and SS&C's original letter expressing continued confusion over Defendants' justification for its right to terminate.  *See* November 18, 2019 SEI Letter, attached hereto as Exhibit I.  That response stated, in part:  "[a]s we discussed and as is clear by the plain language of our agreements and the associated order schedules, there is no basis for such belief.  Indeed, as discussed, the negotiated language of the contract precludes Advent from any such termination.  Accordingly, any suggestion to the contrary by Advent is hereby rejected."  *Id*.

55.   On December 5, 2019, Jason White, Group General Counsel, responded and sent a letter to SEI on "SS&C" letterhead.  *See* December 5, 2019 SS&C/Advent Letter, attached hereto

as Exhibit J.  In Mr. White's letter, for the first time after the parties' letter correspondence and two conference calls, Defendants alleged that "on multiple occasions SEI has solicited to hire Advent employees in breach of Section 11.9 of the Software License and Support Agreement[.]" Defendants also stated that SEI's adherence to the plain language of the contract regarding perpetuity is "strained and aggressive" and "would not be enforceable under the law."  *Id*. Defendants also emphasized that their "willingness to participate in commercial negotiations is not limitless."  *Id*.

56.     SS&C's claim that it was now terminating the licenses for cause was new as Defendants have never provided formal notice to SEI of any breach of the Agreement, nor provided the contractually-mandated opportunity to cure.  *See* Order Schedule 17 at Section H.2, attached hereto as Exhibit C ("Advent may terminated the Agreement in the event Licensee fails to perform a material obligation under the Agreement and fails to cure such breach within thirty (30) days following written notice of such failure.").  Defendants never provided a cease and desist letter and never even identified the person(s) SEI allegedly solicited.

57.     On December 11, 2019, James Warren at SEI responded to Advent and SS&C's letter.  *See* December 11, 2019 SEI Letter, attached hereto at Exhibit K.  As that response explained to Defendants, under the Agreement's governing law, perpetual licenses are allowable.  SEI also explained that the non-solicitation provision it allegedly breached does not relate to a material obligation and cannot form the basis of a proper termination.  SEI further stated:  "Although we appreciate your willingness to negotiate, your changing and unsupported positions are concerning as they show an intent to gain an improper competitive advantage.  In any event, we invite you to make a proposal for our consideration.  If, however, as your first letter stated, Advent has concluded that it 'is unwilling to renew or extend the present term' of our licensing agreement,

such an effort to deny SEI integral licensed services and data, or otherwise improperly interfere with our contractual rights, will cause imminent, substantial, and irreparable harm to our business." *Id*.

58.     Mr. Warren of SEI has engaged in subsequent discussions with Defendants in an effort to resolve this dispute in good faith.  However, Defendants' pricing proposal included an over 40% increase in rates to SEI, despite the Agreement's 3% cap on price increases per year. This proposal is in itself a breach of the Agreement and is an attempt to extort SEI.  As a 40% increase is clearly not made in good faith, this proposal is unacceptable to SEI.

59.     Defendants also proposed a new pricing structure which was based upon assets under management.  This new structure is contrary to the terms of the Agreement, was similarly not made in good faith, and is also unacceptable to SEI.

60.     Defendants cannot create a path to termination by manufacturing rate disputes that are contrary to the terms of the Agreement.

61.     On January 16, 2020, Defendants sent SEI a new proposed amendment to the Agreement that had a "placeholder" for the price.  *See* Proposed Amendment, attached hereto as Exhibit L.  SEI refused to sign the amendment with the requested 40 percent upcharge when the Agreement still remained in effect pursuant to its terms and had not been properly terminated by either party.  However, SEI continued to negotiate the price in good faith, still attempting to receive the benefit of its original bargain under the Agreement.

62.     On January 22, 2020, Defendants sent SEI a "settlement agreement" with a broad general release whereby SEI would release both Advent and SS&C from any wrongdoing. Defendants proposed that this Agreement would be signed along with the proposed amendment. SEI refused to sign the release without knowing what it was specifically releasing and continued

to refuse to accept the 40% rate increase.  *See* January 24, 2020 SEI Letter, attached hereto as Exhibit M.

63.     On January 27, 2020, Defendants provided a year-long key to SEI, extending licenses for the Geneva and Moxy products through January 20, 2021 so the parties could continue to negotiate the potential amendment as well as Defendants' proposed settlement agreement.[3]

64.     While the parties continued to negotiate pricing, Defendants pushed for SEI to sign the amendment and release.

65.     On January 31, 2020, Defendants sent an email to SEI stating:  "As of today, the Geneva term ends.  We extended the key beyond the term end date so we have breathing room and so that you aren't interrupted, but we need to ultimately determine if we have a new deal or the default wind down so we can account and bill appropriately."  *See* January 31, 2020 Email from R. Roley to J. Warren, attached hereto as Exhibit N.

66.     SS&C's strong-armed tactics were once again openly discussed during its February 12, 2020 earnings call when SS&C admitted that "the biggest opportunity for [price increases] is in some of our outsourcing businesses, where we haven't in the past been as diligent, so that includes funds, services and others.  And we're working through that with customers.  And thus far, they've been pretty receptive to that process and it's going well."  *See* SS&C February 12, 2020 Q4 2019 Earnings Call, *available at* https://seekingalpha.com/article/4323712-ss-and-c-technologies-holdings-ssnc-ceo-bill-stone-on-q4-2019-results-earnings-call.  SS&C predicted that growth in its "software business will probably range somewhere in the 3% to 5% range."  *Id.*

---

[3] While SEI does not seek a preliminary injunction at this time in order to prevent Defendants from "pulling the plug" on SEI's licenses to the Advent software, SEI will likely need to seek such relief from this Court if this dispute is not resolved prior to January 20, 2021, when Defendants have unilaterally decided they will no longer provide the products to SEI despite the Agreement's clear and unambiguous language to the contrary.

67.     It has now become clear to SEI that Defendants have improperly threatened claims of non-renewal or breach and terminated the Agreement in an attempt to destroy critical parts of SEI's business.  This termination is evident based on Defendants' correspondence, stating, for example, "[t]herefore and for the avoidance of doubt, you are hereby notified that Advent hereby elects not to renew any of the Products upon the expiration of their current terms."  *See* October 31, 2019 SS&C/Advent Letter, attached hereto as Exhibit H.   Defendants' subsequent correspondence has confirmed that they are treating the Agreement as not renewed or terminated and that they are taking the position that they are permitted to "end" the Geneva term.. *See* January 31, 2020 Email from R. Roley to J. Warren, attached hereto as Exhibit N ("As of today, the Geneva term ends . . . we need to ultimately determine if we have a new deal . . .").

68.     Plaintiff has not breached the Agreement, and there is no proper basis for Defendants to terminate the Agreement.  Further, Defendants do not have the ability to not renew the Agreement.

69.     Defendants' improper non-renewal or termination will harm SEI because it does not have a replacement for the functionality and information provided by Defendants, and SEI will be damaged within a day of losing access to Advent's applications.  While there may be other systems available in the market, those provided by Defendants are well-regarded and well-known, and many of SEI's customers expect that Defendants' specific software will be used.  Even if SEI was able to locate a suitable replacement, it is anticipated that it will take **at least three years** for SEI to convert its business to a new system, and SEI will lose many of its customers that rely on this information in the meantime and suffer additional harm to its reputation and goodwill in the industry.

70.     Defendants' improper non-renewal or termination of the Agreement leaves SEI without access to the critical software for which it bargained.  Without continuous access to this software, which is critical for SEI's day-to-day operations and is expected from its customers, SEI's goodwill and reputation with its customers and within the relevant market will necessarily be injured.  Further, SEI's lack of access to this software will cause customers to depart SEI for SS&C—precisely the anticompetitive result that SS&C seeks.

71.     SS&C, a direct competitor of SEI, will benefit from this improper non-renewal or termination as it will have access to the very software that SEI's customers desire, leaving SEI to figure out a way to compete without the standard industry software that it bargained for in the Agreement.

## COUNT I – BREACH OF CONTRACT

72.     SEI incorporates by reference paragraphs 1 through 71 hereof as if the same were fully set forth.

73.     The License and Service Agreement, and amendments thereto, is a valid contract conveying perpetual and renewable licenses to SEI that may only be terminated by Defendants upon SEI's failure to perform a material obligation imposed thereunder.

74.     SEI has performed all of its material obligations under the License and Service Agreement, its amendments, and the related Black Diamond Agreement (collectively, the "Agreements").

75.     Defendants have materially breached the Agreements by improperly terminating the Agreement and refusing to provide perpetual licenses and services to SEI as mandated under the contract.

76.     Defendants have also materially breached the Agreements by refusing to comply with the Agreement's mandated maximum price increases, instead trying to force SEI to sign on to extortionate rate increases.

77.     Defendants have no basis to not renew or terminate the Agreements.

78.     As a result of this improper termination, as of January 20, 2021, Defendants will, in violation of their contractual obligations, leave SEI without access to the critical products upon which it runs its business.

79.     Defendants have no basis to refuse to perform their obligations under the Agreements.

80.     SEI and Defendants are all able to continue performing their obligations under the Agreements.

81.     As a direct and proximate result of Defendants' improper non-renewal or termination of the Agreements, SEI will suffer irreparable harm to its client business, including monetary and reputational damage.

82.     SEI cannot be made whole by money damages because they would be inadequate to protect the expectation of SEI and the calculation of money damages is too uncertain.  SEI instead requires equitable relief in the form of specific performance in order to remedy Defendants' breach.

WHEREFORE, SEI hereby demands judgment in its favor and against Defendants on Count One of its Complaint for equitable relief in the form of specific performance, as well as any other relief as this Court may deem just and proper.

## COUNT II - DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201(a)

83.     SEI incorporates by reference paragraphs 1 through 82 hereof as if the same were fully set forth.

84.     Defendants' improper termination and refusal to renew the License and Service Agreement is contrary to the plain terms of the License and Service Agreement.

85.     The relevant language of the Agreements is unambiguous.   Paragraph 10.1 explicitly states that the licenses "will remain in effect perpetually[.]"  Agreement, attached hereto as Exhibit A.  Further, paragraph 10.2 allows Advent to terminate only "if Licensee fails to perform any material obligation under this Agreement."  *Id.*

86.     Similarly, Order Schedule 17, which was executed on January 20, 2009, and addresses the licenses for the Geneva and Moxy software, also provides that SEI has a perpetual license to this software unless SEI, the licensee, terminates the Agreement.  It specifically states that "[a]t the end of any Initial Term or renewed Term, as applicable, and subject to the terms hereof, the Term of this Order Schedule shall automatically renew for an additional three (3) year period at the Renewal Fee . . . unless Licensee [SEI] provides sixty (60) days written notice to Advent prior to the expiration of the then-current Term of its intent not to renew."  Order Schedule 17 at Section H.2, Exhibit C.

87.     The licenses for the software provided in Order Schedule 21 and the Black Diamond Agreement similarly continue automatically unless SEI decides not to renew.  Order Schedule 21, Section B, attached hereto as Exhibit O; Black Diamond Agreement Data Sheet, attached hereto as Exhibit R.

88.     Notwithstanding these provisions, Defendants have stated that they do not intend to honor the perpetual licenses and are not renewing or terminating the Agreements unless the

parties can come to an agreement on an amendment, which would require SEI to pay 40% more than it previously did for the same products.

89.     The Software Agreement provides for a Wind Down Period and three years of Transition Assistance in the event of a non-renewal or termination, and the Black Diamond Agreement similarly provides for nine months of Transition Assistance.

90.     In the event that the Court determines that SS&C does have a basis to not renew or terminate the Agreements (which SEI disputes), SEI requests a declaration that it is entitled to the Transition Assistance provided for in the Agreements.

91.     An actual controversy currently exists between the Plaintiff and the Defendants with respect to (i) whether Defendants have breached the Agreements by refusing to honor its grant of perpetual licenses terminable only in certain circumstances, (ii) whether SEI is entitled to specific performance of the Agreements, and (iii) regardless of the foregoing, whether SEI is entitled to Transition Assistance of at least three years from Defendants.

92.     As illustrated by the parties' correspondence and impasse, litigation is imminent and inevitable.

93.     Declaratory relief will resolve some or all of the disputes between the parties.

WHEREFORE, SEI hereby demands judgment in its favor and against Defendants on Count Two of its Complaint declaring that Defendants have improperly not renewed or terminated the Agreements, or, in the alternative, that SEI is entitled to the Transition Assistance provided for in the Agreements, and finding that SEI is entitled to specific performance of the Agreement, together with any other injunctive or equitable relief as the Court may deem just and proper.

## COUNT III - TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTUAL RELATIONS

94.     SEI incorporates by reference paragraphs 1 through 93 hereof as if the same were fully set forth.

95.     SEI has valid contracts with its many clients to provide a wide variety of services, including portfolio accounting, investment advice, wealth management, IT services, customized investment solutions, and an enterprise global operating platform.  As part of those contracts, SEI uses Defendants' software to provide information to its clients.

96.     Defendants have knowledge of SEI's existing and prospective contractual relationships.

97.     Defendants acted purposefully in refusing to uphold their contractual obligations to provide perpetual licenses to the Advent software to SEI.  This purposeful withholding will (1) preclude SEI from fully servicing its clients by impairing its day-to-day abilities, (2) injure SEI's reputation and goodwill within the relevant market of outsourced portfolio accounting (and related administrative) services for investment managers and hedge funds, and (3) prevent SEI from successfully competing with SS&C for the same customers.

98.     Defendants' conduct directly threatens and interferes with numerous other SEI contracts that were executed, at least in part, with the understanding that SEI would retain its perpetual licenses to Advent's products and provide the associated data to its customers on a daily basis.

99.     Upon information and belief, Defendants have contacted SEI's existing customers and have condemned or otherwise criticized SEI's abilities and services in an effort to take SEI's customers.

21

100.    Defendants' prior attempts to improperly take SEI's customers will be greatly strengthened through denial of SEI's access to Advent's investment processing capabilities, significantly interfering with SEI's contractual obligations to its investment manager clients.

101.    By formulating and implementing its unlawful scheme to eliminate competitors of SS&C, through the refusal to respect or otherwise uphold a nearly two-decade-old grant of perpetual licenses, Defendants have intentionally, knowingly, and maliciously interfered with SEI's contractual relationships with its customers.

102.    Defendants' aforesaid conduct affects licenses that are invaluable and, unless restrained, will cause SEI irreparable future harm.

WHEREFORE, SEI hereby demands judgment in its favor and against Defendants on Count Three of its Complaint for all damages flowing from Defendants' tortious interference with SEI's current and prospective contracts, including without limitation for lost sales, lost profits, lost customers, loss of good will, together with pre- and post-judgment interest, attorneys' fees, costs of suit and injunctive or other equitable relief, as well as any other relief as this Court may deem just and proper.

### COUNT IV – NEW YORK GENERAL BUSINESS LAW § 349

103.    SEI incorporates by reference paragraphs 1 through 102 hereof as if the same were fully set forth.

104.    Defendants have engaged in unfair competition and unfair trade practices in violation of New York General Business Law § 349 due to their anticompetitive behavior, including the improper termination of the Software Support and License Agreement and Black Diamond Agreement.  That termination is unlawful, unfair, and/or fraudulent and was done with the intent to eliminate SEI as a competitor.

105.    SEI will be directly harmed by Defendants' unlawful, unfair, and/or fraudulent termination of the Agreement.

106.    Additionally, SEI's customers and other competitors of SS&C will be harmed.  The relevant customers will have fewer choices in providers of outsourced portfolio accounting services.  Given Defendants' conduct with respect to SEI, as well as statements that they are exploring price increases across their "entire client base," SEI expects that other competitors will be similarly targeted unless SS&C is restrained.

WHEREFORE, SEI hereby demands judgment in its favor and against Defendants on Count Four of its Complaint for all damages flowing from Defendants' violation of New York General Business Law § 349, including without limitation for lost sales, lost profits, lost customers, loss of good will, together with pre- and post-judgment interest, attorneys' fees costs of suit and injunctive or other equitable relief, as well as any other relief as this Court may deem just and proper.

## COUNT V – VIOLATIONS OF SECTION 2 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. SECTION 2

107.    SEI incorporates by reference paragraphs 1 through 106 hereof as if the same were fully set forth.

108.    By improperly terminating the Agreement, Defendants have a dangerous probability of obtaining a monopoly in the market for outsourced portfolio accounting services for investment managers and hedge funds, a market in which SEI and SS&C are head-to-head competitors.

109.    Defendants' conduct is motivated by a specific intent to monopolize, specifically to eliminate competition in the outsourced portfolio accounting services market, furthering SS&C's expressed desire to "take over the world."  That intent is evidenced, in part, by

Defendants' decision to terminate the 19-year-old Agreement with SEI, a decision they reached only after Advent's acquisition by SS&C, as well by their desperate efforts to test a variety of disingenuous bases for trying to find a way out of the Agreement.  Defendants, by their own admissions in statements to investors, are targeting their entire client base with aggressive conduct, seeking to increase their position and power over the market for the provision of outsourced portfolio accounting services for investment managers and hedge funds.

110.    Defendants' attempted monopolization is a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ("Section 2").

111.    The provision of outsourced portfolio accounting services to investment managers and hedge funds is a relevant market for antitrust purposes and the market Defendants are attempting to monopolize by terminating the Agreement.  Outsourcing portfolio accounting services to companies with accurate and reliable books and records accessible through use of the Advent software allows investment managers to make investment decisions for the portfolios they manage, determine the value and performance of the portfolios they manage, assess the effectiveness of their investment strategies, and otherwise fulfill their obligations to their customers.

112.    All investment managers and hedge funds require portfolio accounting services and the only alternative to outsourcing those responsibilities is for an investment manager or hedge fund to have their own employees perform those functions.  But, for investment managers and hedge funds that have already made the decision to outsource their portfolio accounting needs, providing those services for themselves is not a reasonable substitute.  An investment manager or hedge fund that has outsourced its portfolio accounting needs to a company like SS&C or SEI would incur substantial cost and disruption if it were to seek to perform the work in house,

including costs associated with hiring a large accounting team, acquiring sophisticated technology, and converting the critical outsourced information for access through their in-house platform.  As a result of these expenses and disruption, few, if any, investment managers and hedge funds that have outsourced their portfolio accounting needs have elected to later undertake those activities themselves, and few, if any, would do so if they faced a small but significant and non-transitory increase in the price of their outsourced portfolio accounting services.

113.    The geographic scope of the relevant market is the United States.  Investment managers and hedge funds prefer to acquire outsourced accounting services from U.S.-based companies because they likely possess superior expertise over U.S. tax and other regulatory requirements.

114.    To compete in the market for outsourced portfolio accounting services, firms like SEI require access to Advent's software.  Although there are other providers of commercially available portfolio accounting software, no other portfolio accounting software is as effective, well-regarded, or in as wide use as Advent's, making continued access by SEI to the software essential for its ability to continue to compete with SS&C.  As SS&C itself conveyed to investors, Advent's software is "mission critical" for companies like SEI, and SS&C obtained important control over the "means of production" in outsourced portfolio accounting through its acquisition of Advent in 2015.  Moreover, because many investment managers and hedge funds will work only with outsourced portfolio accounting service providers that have access to Advent's software, Defendant's termination of the Agreement would make SEI unsuitable to many clients and result in competitive harm, even if SEI were to find a functional replacement for Advent's software.

115.    SEI could not practically or reasonably duplicate Advent's software because, in order to find a functional replacement, SEI would need years to research other systems, select a

replacement, contract with a vendor, and convert business.  And this process would come at such a significant competitive cost that SEI's services would be diminished to the point it could not compete effectively.

116.    Control over Advent's software provides Defendants the ability by withholding that software to foreclose competition from other providers of outsourced portfolio accounting services.  SS&C's ownership of Advent's "mission critical" software also ensures that companies seeking to compete with SS&C in providing outsourced portfolio accounting services have to deal with their largest competitor, creating a barrier to entry into the relevant market.

117.    Defendants' efforts to terminate the Agreement and deny access by SEI to the essential Advent software constitutes anticompetitive and exclusionary conduct in furtherance of their attempt to monopolize the relevant market.  Until now, SEI and Defendants maintained a long and firmly established course of dealing between the parties, during which Defendants demonstrated that it is feasible for them to provide access on reasonable terms to Advent's software.  From 2000 to 2019, Advent maintained its relationship with SEI as a voluntary and profitable course of conduct.  SS&C likewise maintained a relationship with SEI as a voluntary and profitable course of conduct from 2015 to 2019.  By terminating the Agreement, Defendants will forego short-term profits they receive from payments from SEI in order to achieve their anticompetitive ends.

118.    Defendants' termination of the Agreement and denial to SEI of access to Advent's software would impede SEI's ability to continue to compete with SS&C in the relevant market, causing damages to SEI's business and to competition in the relevant market.  SS&C's anticompetitive conduct is not directed to SEI alone.  SS&C described for investors its strategy of extending the pressure it has placed on SEI to its "entire client base."  Like SEI, SS&C's other

competitors will face the choice of paying substantially higher costs and undercutting their competitiveness, or losing access to essential software.  Defendants' conduct threatens to leave SS&C with a monopoly in the relevant market and the ability to impose anticompetitive price increases on its customers.

119.    Any alleged basis for termination of the Agreement is an improper and contrived pre-textual justification.

120.    The attempted monopolization will occur within the flow of and substantially affect interstate commerce.

121.    As a direct and proximate result of Defendants' attempt to monopolize and concrete acts in furtherance, Plaintiff has and will be injured in its business and property by reason of Defendants' violation of Section 2, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

122.    Plaintiffs' injuries are the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

123.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff is entitled to treble damages, costs and attorney fees for the violation of the Sherman Act alleged herein.

WHEREFORE, SEI hereby demands judgment in its favor and against Defendants on Count Five of its Complaint for all damages flowing from Defendants' violation of the Sherman Antitrust Act, including without limitation treble damages, attorneys' fees and costs of suit as well as any other relief as this Court may deem just and proper.

## COUNT VI – PROMISSORY ESTOPPEL

124.    SEI incorporates by reference paragraphs 1 through 123 hereof as if the same were fully set forth.

125.    In the alternative, in the event that this Court finds that the Agreements at issue do not provide for a perpetual license to the relevant software, Defendants unambiguously promised SEI that it would have a perpetual and/or automatically renewable license to all the software necessary to run its business.

126.    Defendants also promised that in the event of non-renewal or termination of the licenses, Defendants would provide SEI with up to three years of transition assistance to ensure that SEI could properly move its affected business to a new platform.

127.    SEI has reasonably relied on the provision of the licenses by Defendants, and has made a complete and substantial change of position because of that reliance.  SEI has promised, contracted for, and its clients expect, to use and deliver the critical data and information provided via Defendants' licenses.

128.    When Advent promised a perpetual license to the software, Advent should have reasonably expected that SEI would alter its business and services to its clients in response, creating ongoing obligations to its customers.

129.    SEI will be irreparably injured if these promises are not enforced.  Without the deliverance of the required software, SEI will immediately lose its ability to service its customers and will lose a substantial amount of customers as well as suffer reputational goodwill.

130.    If Defendants' promise is not enforced, an injustice will result because not only will SEI be harmed, but those customers will likely turn to Defendants—as SS&C is a direct competitor of SEI—giving SS&C an unfair competitive advantage in the market and undermining SEI and other similarly-situated companies.

WHEREFORE, SEI hereby demands judgment in its favor and against Defendants on Count Six of its Complaint for all damages flowing from Defendants' actions, including without

limitation for lost sales, lost profits, lost customers, loss of good will, together with pre- and post-judgment interest, attorneys' fees, costs of suit and injunctive or other equitable relief, as well as any other relief as this Court may deem just and proper.

## COUNT VII – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

131.    SEI incorporates by reference paragraphs 1 through 130 hereof as if the same were fully set forth.

132.    The Agreement is a written contract governed by the laws of the State of New York.

133.    As a written contract, the Agreement contains the implied covenant of good faith and fair dealing.  This covenant requires that neither party do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

134.    Defendants breached their duty to SEI by, among other things, improperly terminating the contract, refusing to honor their obligations to provide a perpetual license under the contract and thus disrupting SEI's ability to service its own customers, demanding that SEI pay a 40% price increase in order to continue receiving licenses that SEI is owed under the contract, and engaging in improper conduct geared toward stealing SEI's existing customers.

135.    Upon information and belief, Defendants have contacted SEI's existing customers and have condemned or otherwise criticized SEI's abilities and services in an effort to take SEI's customers.  Defendants' prior attempts to improperly take SEI's customers will be greatly strengthened through denial of SEI's access to Advent's investment processing capabilities, significantly interfering with SEI's contractual obligations to its investment manager clients.

136.    As a result of Defendants breaches of the implied covenant of good faith and fair dealing, SEI has been and will continue to be injured.

WHEREFORE, SEI hereby demands judgment in its favor and against Defendants on Count Seven of its Complaint for all damages flowing from Defendants' breach of the implied covenant of good faith and fair dealing, including without limitation for lost sales, lost profits, lost customers, loss of good will, together with pre- and post-judgment interest, attorneys' fees, costs of suit and injunctive or other equitable relief, as well as any other relief as this Court may deem just and proper.

### **JURY DEMAND**

SEI hereby demands a trial by jury of all issue so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.


Dated: May 14, 2020                              Respectfully submitted,

HOLLAND & KNIGHT LLP

By: _____
     James E. DelBello
     Cira Centre, Suite 800
     2929 Arch Street
     Philadelphia, PA  19104
     Telephone:  215.252.9600
     Fax:  215.867.6070

     *Attorney for SEI Global Services, Inc.*

## CERTIFICATE OF SERVICE

I, James E. DelBello, do hereby certify that on May 14, 2020, a true and correct copy of

Plaintiff SEI Global Services, Inc.'s First Amended Complaint was filed via the Court's ECF

system and also served upon the following counsel for Defendants SS&C Advent and SS&C

Technologies Holdings via email:

> Stephen Fishbein
> Christopher LaVigne
> Benjamin Klebanoff
> SHEARMAN & STERLING LLP
> 599 Lexington Avenue
> New York, New York 10022-6069
> Telephone: 212-848-4000
> Facsimile: 212-848-7179
> sfishbein@shearman.com
> christopher.lavigne@shearman.com
> benjamin.klebanoff@shearman.com
>
> Peter M. Ryan
> Thomas A. Leonard
> COZEN O'CONNOR
> One Liberty Place
> 1650 Market Street, Suite 2800
> Philadelphia, Pennsylvania 19103
> Telephone: 215-665-2000
> Facsimile: 215-701-2157
> pryan@cozen.com
> tleonard@cozen.com
>
> *Attorneys for Defendants SS&C Advent and SS&C*
> *Technologies Holdings, Inc.*

> */s/ James E. DelBello*
> James E. DelBello