IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEI GLOBAL SERVICES, INC., | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 20-1148 |
| | : | |
| SS&C ADVENT and SS&C | : | |
| TECHNOLOGIES HOLDINGS, INC., | : | |
| *Defendants.* | : | |

**MEMORANDUM**

**KENNEY, J.**                                                                 **October 23, 2020**

Defendants SS&C Advent and SS&C Technologies Holdings, Inc. (collectively "SS&C")
move to dismiss Plaintiff SEI Global Services Inc.'s ("SEI") Second Amended Complaint, which
asserts against SS&C an attempted monopolization claim in violation of federal antitrust law and
claims under New York law including breach of contract, tortious interference with existing and
prospective business relations, and violation of the New York General Business Law. SEI and
SS&C compete in the market for outsourced portfolio accounting services for investment
managers and hedge funds.

SEI alleges SS&C acquired Advent—and more significantly, its software—and then, four
years after acquiring Advent, terminated Advent's longstanding contract with SEI to deprive SEI
of Advent's software. SEI alleges SS&C now intends to wield its acquired software to monopolize
the market for outsourced portfolio accounting services, the provision of which requires Advent's
software. We held oral argument on the motion on July 30, 2020. Because we find that SEI has
not pleaded a proper basis for its attempted monopolization claim or established antitrust standing

we will grant Defendants' motion and dismiss Count VI in Plaintiff's Second Amended Complaint with prejudice.[1] We will dismiss Plaintiff's remaining claims without prejudice.

## I.      STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010)) (internal quotation marks omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[2]

Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) we "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;' " (2) we "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;' " and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675).

---

[1] We explain the futility of permitting SEI to make what would be a fourth attempt at pleading a viable antitrust claim later in our opinion.

[2] *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 ("insist[ing] upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" to an "inevitably costly and protracted discovery phase.").

## II.      BACKGROUND[3]

Plaintiff SEI Global Services, Inc. ("SEI")'s federal antitrust claim concerns Defendants' SS&C Advent and SS&C Technologies Holdings, Inc. (collectively "SS&C") alleged attempt to monopolize the market for outsourced portfolio accounting services for investment managers and hedge funds. Investment managers, hedge funds and other financial institutions hire third parties— like SS&C and SEI—to provide accounting services. In doing so, they avoid incurring the significant expenses of maintaining in-house accounting departments and developing internal portfolio accounting software. ECF No. 24 ¶¶ 166–167.

SEI provides its investment management and hedge fund customers with outsourced portfolio accounting services using Advent software it licensed from Advent directly and now licenses from SS&C since SS&C's Advent acquisition. *Id.* at ¶ 3. SEI has used Advent's software since 2000, when SEI and Advent entered into a Software License and Support Agreement,[4] *id.* at ¶¶ 5–6, which set pricing terms that SS&C now seeks to renegotiate to rates over forty percent higher. *Id.* at ¶ 67. Seventy percent of the top twenty outsourced portfolio accounting services providers use Advent's software for services they provide to their customers. *Id.* at ¶ 171. SEI's customers hold Advent's software in high regard and expect that SEI will use Advent's software to provide its portfolio accounting services. *Id.* at ¶ 78.

---

[3] We "accept as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and construe[] them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). We draw the following facts from the Second Amended Complaint and the attached exhibits. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complaint's claims are based upon these documents."). We include SEI's well-pleaded factual allegations as they pertain to our discussion.

[4] Separately, SEI entered into a license agreement with Black Diamond, a wholly-owned Advent subsidiary, to use Black Diamond products and services in 2014. ECF No. 24-17.

The operative agreement between SEI and Advent, the Software License and Support Agreement, provides that "each license granted hereunder, unless otherwise agreed, will remain in effect perpetually unless and until terminated by mutual agreement of the parties…" ECF No. 24-1 at § 10.1. However, while SEI could "terminate the Software License and Support Agreement or any license at any time," Advent could only terminate the Agreement or a license to Advent's software if SEI failed to perform a material contractual obligation and failed to cure its nonperformance within thirty days of receipt of written notice. *Id.* at § 10.2; ECF No. 24 at ¶ 48.

From 2000 to 2019, SEI placed orders for Advent's licensed software products using Order Schedules that were integrated into the Software License and Support Agreement. ECF No.24 at ¶ 6. The parties agreed to several Order Schedules and amendments to the Software License and Support Agreement that altered the parties' contractual rights. *Id.* at ¶¶ 37–46. Any rate increases included in an amendment or Order Schedule were subject to a three percent yearly price increase cap. *Id.* at ¶ 67.

In 2015, SS&C acquired Advent. *Id.* at ¶ 54. For four years after SS&C acquired Advent, SEI continued to renew the licenses for SS&C Advent's software. *Id.* at ¶ 172. On October 31, 2019, SS&C notified SEI by letter that it did not intend to renew any products and services after the expiration of their current license terms. *Id.* at ¶ 55. The parties discussed SS&C's allegedly improper termination orally and in writing and attempted to resolve the contractual dispute into early 2020. *Id.* at ¶¶ 59–74. SEI rejected several of SS&C's proposed amendments to the Software License and Support Agreement, including a forty percent rate increase, that it believed were not made in good faith and contrary to the Agreement's yearly rate increase cap. *Id.* at ¶¶ 67–71.

After SEI pointed out SS&C's "troubling anti-competitive behavior," SS&C extended SEI's licenses to Advent software by one year to allow the parties more time to negotiate, but

notified SEI that it considered the license term terminated. *Id.* at ¶¶ 72–74. On an earnings call a few weeks later, SS&C discussed its efforts to increase prices with its customers in the outsourcing business where it had not "in the past been as diligent." *Id.* at ¶ 75. SEI believed that SS&C's termination of the Software License and Support Agreement left it with no recourse but to file this action. *Id.* at ¶¶ 76-80.

SEI filed a Complaint alleging seven counts: attempted monopolization under Section 2 of the Sherman Antitrust Act, declaratory judgment, and breach of contract, tortious interference with contract, unfair competition, promissory estoppel, and breach of the covenant of good faith claims under New York law. SEI filed an Amended Complaint, ECF No. 19, which SS&C moved to dismiss. ECF No. 21. Without seeking leave, SEI filed its Second Amended Complaint (ECF No. 24) addressing pleading deficiencies SS&C identified in its Motion to Dismiss. Rather than striking the Second Amended Complaint without prejudice to file a Motion to Amend, for efficiency's sake, we allowed SEI's amended filing. Pending before us is SS&C's Second Motion to Dismiss (ECF No. 29), which incorporates by reference SS&C's first Motion to Dismiss (ECF No. 21).

## III.    DISCUSSION

Defendants move to dismiss SEI's Second Amended Complaint with prejudice, contending that SEI fails to plead the requisite elements of an attempted monopolization claim under Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2) ("Section 2") and lacks antitrust standing. We find that SEI has not adequately pleaded an attempted monopolization claim and that SEI lacks antitrust standing. We first discuss SEI's pleaded antitrust violation and then discuss SEI's antitrust standing.[5]

---

[5] Our Court of Appeals has not yet resolved whether we should first address an antitrust violation or antitrust injury. *Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018).

### A.      Antitrust Violation-Attempted Monopolization under Section 2

In Count VI, SEI alleges that SS&C violated Section 2 of the Sherman Antitrust Act through attempted monopolization of trade. SEI alleges that SS&C attempts to monopolize the market for outsourced portfolio accounting services to investment managers and hedge funds by terminating the parties' Software License and Support Agreement.

Section 2 makes it unlawful to "monopolize, or attempt to monopolize," interstate or international commerce. 15 U.S.C. § 2. It is "the provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007). "[Section] 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993).

A plaintiff bringing an attempted monopolization claim must allege that: (1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir.2010) (internal quotations omitted). "Liability hinges on whether valid business reasons, as part of the ordinary competitive process, can explain [SS&C]'s actions that resulted in a dangerous probability of achieving monopoly power. *Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir.), *cert. denied*, 139 S. Ct. 211 (2018) (citing *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 393 (3d Cir. 2016)). We must "carefully scrutinize[] enforcement efforts by competitors because their interests are not necessarily congruent with the consumer's stake in competition." *Barr Lab'ys, Inc. v. Abbott Lab'ys*, 978 F.2d 98, 109 (3d Cir.1992).

As an essential part of its case, SEI must articulate the relevant product and geographic market, and explain SS&C's power within the market. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 436 (3d Cir. 1997). We discuss first the relevant product market; second, the relevant geographic market; and third, SS&C's power within that market to assess the plausibility of SEI's claim that SS&C has a dangerous probability of achieving monopoly power in the relevant market. We then discuss whether SEI pleaded facts establishing that SS&C's increased market power was or will be achieved through predatory or anticompetitive conduct that was accompanied by an intent to monopolize the market, rather than through growth, a superior product, business acumen, or historic accident. *See Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d at 307. However, because we will find that SEI has not alleged facts permitting us to conclude that SS&C engaged in anticompetitive conduct, we will not need to address SS&C's specific intent.

### 1. *SEI Articulates a Relevant Product Market*

We determine "the outer boundaries" of a relevant product market by looking to the "reasonable interchangeability of use" between the product itself and the alleged substitutes for it. *Id* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Interchangeability of use means that one product is "roughly equivalent" to another product for its intended use. *Id*. at 437. "In most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Id.* at 436. Dismissal may be appropriate where a plaintiff "(1) fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," or (2) "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Id*. at 436–437 (collecting cases). Accepting the facts in SEI's Second Amended Complaint as true, we ask whether the market articulated in the complaint is

"implausible." *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 183 (3d Cir. 2015).

SEI argues that SS&C is its competitor in "the provision of outsourced portfolio accounting services to investment managers and hedge funds" market within the United States. ECF No. 24 at ¶¶ 166, 168. SEI supports this market definition by alleging that performing portfolio accounting services in-house is not a reasonable substitute for investment managers and hedge-funds that have outsourced their portfolio accounting services to a third-party given the switching costs to providing in-house portfolio accounting services. *Id.* at ¶ 167. SS&C does not contest SEI's exclusion of in-house portfolio accounting services from its market definition. SS&C argues instead that SEI has improperly excluded outsourced portfolio accounting services for financial institutions other than hedge funds and investment managers from its relevant market definition and has failed to explain its narrowly defined market. ECF No. 29 at 9.

Not every narrowly drawn market fails as a matter of law, but a plaintiff seeking to exclude supposed substitute products must plead facts distinguishing a proposed market from those supposed substitutes. *See Hanover 3201 Realty*, 806 F.3d at 183. And, a plaintiff who excludes arguable substitutes from its definition should "offer an explanation for why they are defining the relevant product market in such narrow terms." *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162, 172 (S.D.N.Y. 1995).

We find plausible SEI's exclusion of in-house portfolio accounting services from its proposed relevant market. Though we agree with SS&C that SEI has offered no plausible explanation for why it excludes outsourced portfolio accounting services for financial institutions other than hedge funds and investment managers from its market definition, we do not find SEI's relevant proposed market of outsourced portfolio accounting services to investment managers and

hedge funds to be implausible. SEI has alleged *some* facts in defining its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand. *See Queen City Pizza, Inc.*, 124 F.3d at 436–437.[6] We decline to reject SEI's proposed relevant market definition at this stage because SEI's pleading of the relevant market contrasts with the dearth of fact that courts have found fail to withstand a motion to dismiss for failure to plead a relevant market as a matter of law. *See*, *e.g. Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. 01-cv-4254, 2002 WL 31246922, at *5–6 (E.D. Pa. Aug. 9, 2002) (dismissing complaint for failure to allege any facts distinguishing a proposed submarket). *See also Queen City*, 124 F.3d at 436 (cautioning that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.").

## 2.   *SEI Articulates a Relevant Geographic Market*

SEI must also define a relevant geographic market. "[T]he relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Hanover 3201 Realty*, 806 F.3d at 183–84 (citation omitted). The geographic market "may be local, regional, national or international in origin*." In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F.Supp.2d 683, 697 (E.D. Pa. 2007). SEI explains that investment managers and hedge funds prefer United States-based providers of outsourced portfolio accounting services because of their familiarity with United States tax law and other regulatory requirements. ECF No. 24 at ¶ 168. SS&C does not contest SEI's claimed geographic market, and we conclude that it is plausible.

## 3.   *SEI's Facts Alleged Do Not  Plausibly Suggest  SS&C's Market Power Creates a Dangerous Probability of Achieving Monopoly Power*

---

[6] SEI at no point explains why outsourced portfolio accounting services to financial industry players other than hedge funds and investment managers are not substitutable for third party portfolio accounting services that cater specifically to hedge funds and investment managers and are therefore in a different market.

To state a claim for attempted monopolization, SEI also must allege that SS&C has increased its market power (or is expected to do so), creating a dangerous probability of achieving monopoly power in the relevant market. *Larry Pitt & Assocs. v. Lundy Law, LLP*, 57 F. Supp. 3d 445, 451 (E.D. Pa. 2014). Our Court of Appeals has held that because the dangerous probability standard is a complex and "fact-intensive" inquiry, courts "typically should not resolve this question at the pleading stage 'unless it is clear on the face of the complaint that the "dangerous probability" standard cannot be met as a matter of law." *Broadcom*, 501 F.3d at 341–342. We may consider "significant market share *coupled* with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand" to determine whether SEI alleged dangerous probability in the pleadings. *Id.* at 342 (emphasis added).

SEI alleges that SS&C's control over the "means of production," its "mission-critical" and "essential" software, enables it to wield its software to force SEI and SS&S's other competitors in the relevant market to choose between paying substantially higher costs for SS&C's software or losing access to the mission-critical software. ECF No. 24 at ¶ 173. SEI alleges that it knows of "no other commercially available portfolio accounting software that is as effective, well-regarded, or in as wide use as [SS&C's]." ECF No. 24 at ¶169. SEI alleges that *if* SS&C succeeds in its efforts to terminate its contract with SEI, and with other competitors, it will "establish a dominant competitive position that gives [it] complete control across the markets in which [it] competes." *Id.*

SS&C challenges SEI's market power allegations, arguing that SEI has failed to amend its Complaint to plead facts showing the concentration of the market or SS&C's market share in the relevant market. ECF No. 29 at 6–7. In its Second Amended Complaint, SEI newly alleges that

seventy percent of the top twenty outsourced portfolio accounting services providers use SS&C's software while some fraction of the remaining thirty percent of the top twenty providers use their own proprietary software that is unavailable to other competitors. *Id.* at ¶ 169. SS&C argues that SEI's new allegation relates only to a different market, the supply of software that outsourced portfolio accounting services providers use to serve their customers and therefore provides no additional information about concentration or market share in the relevant outsource portfolio accounting services market. ECF No. 29 at 6–7.  While SEI's new allegation fails to indicate SS&C's market share in the context of all competitors in the outsourced portfolio accounting services market, it does reveal that SEI and SS&C have other competitors in a dynamic market of *at least* twenty competitors. *See Philadelphia Taxi Ass'n, Inc*., 886 F.3d at 342.  SEI's unwillingness to articulate SS&C's market share is a significant consideration in our evaluation of whether SEI has plausibly alleged that SS&C has increased its market power or that is expected to do so. *See Barr Lab'ys, Inc.*, 978 F.2d at 112.

Nevertheless, market share is one factor—albeit the most significant factor—that we consider in determining whether SS&C has a dangerous probability of successful monopolization. *Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir. 1994). We may also consider other factors, including anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand. Entry barriers include "regulatory requirements, high capital costs, or technological obstacles that prevent new competition from entering a market." *Philadelphia Taxi Ass'n, Inc*., 886 F.3d at 342 (citations omitted). "No single factor is dispositive." *Id.* SEI does not allege that SS&C has unique information in the form of the knowledge, expertise, and technology necessary to provide outsourced portfolio accounting services.  Rather, investment managers and hedge funds prefer

that their outsourced portfolio accounting services providers use SS&C's software in providing that service. ECF No. 24 at ¶ 171.

SEI has not pleaded that new entrants to the market will be unable to contract with SS&C for its software or that no other alternative software exists. SEI alleges that "certain of the remaining [top twenty] providers rely on proprietary platforms unavailable to SEI or other competitors." *Id.* at ¶ 169.  From this allegation, we could infer that "certain of the remaining [top twenty] providers" rely on some other category of accounting software. *See Tatis*, 882 F.3d at 426 (permitting courts to "accept as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them…"). Even if the full thirty percent of the arbitrarily defined top-twenty providers use their own proprietary software, SEI's allegation does not lead to the inference that new competition would be unable to enter the market using their own proprietary software, or some other software. *See* 4 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 807a (4th ed. 2017) ("[E]asy entry—particularly historical evidence of entry—is even more significant in the attempt case than in monopolization cases generally.").  SEI's allegations thus fail to establish current barriers to entry but do provide historical evidence of entry to the relevant market.

 SEI alleges harmful industry developments and suggests that SS&C will wield its monopoly power over the market for portfolio accounting software to gain market power in the relevant market. ECF No. 24 at ¶ 171 (concluding that SS&C has monopoly power in the portfolio accounting services software market because seventy percent of the top twenty outsourced portfolio accounting services providers use SS&C's software). "[E]ven if other commercially available portfolio accounting systems were to exist," SEI, and its competitors that rely on SS&C's software would need years to evaluate, contract with, and convert their businesses to a new

platform, a process that, even if ultimately successful, would materially impair them as competitors.  ECF No. 30 at 12. These allegations do not make the inference plausible that SEI will be able to drive out competition from the relevant market. And, if SS&C were to raise its prices as SEI alleges it *would be able to* do once it becomes the dominant competitor, other rivals would be encouraged to enter the relevant market to battle SS&C through price competition. *See Philadelphia Taxi Ass'n*, 886 F.3d at 342.

SEI also alleges that SS&C's earnings call comments—customers have been "receptive" to SS&C's efforts to increase prices for its software—indicate the inelasticity of the market. ECF No. 24 at ¶ 167. SEI argues that SS&C customers' receptiveness to price increases for software reveals a insensitivity to market price that make it dangerously probable that SS&C will achieve a monopoly in the relevant market. ECF No. 30 at 6 (relying on *BanxCorp v. Bankrate Inc.*, No. 07-3398, 2011 WL 6934836, at *24 (D.N.J. Dec. 30, 2011). Standing alone, SEI's allegations of price insensitivity are insufficient to demonstrate that SS&C has a dangerous probability of achieving monopoly power. *Cf. BanxCorp*, 2011 WL 6934836 at *24 (finding allegations of defendant's 95% market share, ability to drive non-compliant competitors out of the market, and absence of direct competitors sufficient to plead the dangerous probability element).

It is the lack of a competitive market in the service to be purchased—for example, a competitive market in outsourced portfolio accounting services to hedge funds and investment managers—that gives a company market power. *See Queen City Pizza*, 124 F.3d at 439 n. 10. SEI has not plausibly alleged that the market for outsourced portfolio accounting services for hedge funds and investment managers is not a competitive market and has not plausibly alleged that SS&C has market power.  We recognize that courts should typically refrain from resolving this question at the pleading stage "unless it is clear on the face of the complaint that the dangerous

13

probability standard cannot be met as a matter of law." *See Larry Pitt & Assocs.*, 57 F. Supp. 3d at 341–342. However, having considered SEI's failure to plead any facts regarding SS&C's market share coupled with its alleged barriers to entry, purported harmful industry development, and elasticity of consumer demand in the relevant market, we find that SEI has not adequately pleaded that SS&C's conduct creates a dangerous probability of achieving monopoly power as a matter of law.

### 4. *SEI Has Not Sufficiently Alleged that SS&C Engaged in Anticompetitive Conduct*

In addition to pleading that SS&C's conduct created a dangerous probability of achieving monopoly power, SEI must plead facts permitting us to infer that SS&C's increased market power was or will be achieved through anticompetitive conduct. Anticompetitive conduct is "generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Broadcom*, 501 F.3d 297 at 308. "Conduct that merely harms competitors…while not harming the competitive process itself, is not anticompetitive." *Id*. "Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003).

As a general rule, "purely unilateral conduct does not run afoul of [S]ection 2 – 'businesses are free to choose' whether or not to do business with others and free to assign what prices they hope to secure for their own products." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (citing *Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 448 (2009)); *see also Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)) (citation omitted) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his

own independent discretion as to parties with whom he will deal.'"); *Broadcom*, 501 F.3d at 316 ("A firm is generally under no obligation to cooperate with its rivals.").

SEI argues that SS&C's conduct falls into two exceptions to the general rule that purely unilateral conduct does not violate Section 2. The Second Amended Complaint proposes that SS&C's termination of the parties' operative agreement constitutes: (1) a refusal to deal in violation of Section 2 of the Sherman Act under the *Aspen Skiing* doctrine; and (2) a denial of an essential facility in violation of Section 2.

### a. *Refusal to Deal*

A firm is generally under no duty to cooperate or deal with its competitors. *See linkLine*, 555 U.S. at 448 "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." Thus, the termination of a contract with a rival does not by itself constitute anticompetitive conduct. *See, e.g.*, *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) ("The mere existence of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal.'"). SEI attempts to shoehorn an alleged breach of a contractual duty to supply software into a full-blown antitrust matter. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition…"). In doing so, SEI would have us impose a perpetual duty to deal on its competitor based on *Aspen Skiing*'s narrow exception to the rule that does not apply to the facts as alleged in this case.

SEI challenges SS&C's termination of the parties' Software License and Support Agreement, arguing SS&C is required to cooperate with SEI under the narrow refusal to deal doctrine created in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

Indeed, SEI, along with other relief, seeks specific performance of the contract. In *Aspen Skiing*, the Supreme Court found that a dominant firm operating three of four mountain ski areas in Aspen, Colorado, had violated Section 2 by refusing to continue cooperating with its smaller rival in offering a combined four-mountain ski pass. *Id*. at 587–595. The Court upheld a jury verdict for the plaintiff, finding that the defendant/monopolist's refusal to continue cooperating with its rival had harmed consumers, and explained that "the evidence support[ed] an inference that [the defendant] was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on it smaller rival." *Id.* at 610–611.

SEI hopes that we will interpret *Aspen Skiing* to require its competitor SS&C to continue to engage in a preexisting course of dealing that its acquired subsidiary Advent began nearly twenty years ago. However, the Supreme Court has cautioned that *Aspen Skiing* "is at or near the outer boundary of [Section] 2 liability." *Trinko*, 540 U.S. at 409. To proceed under *Aspen Skiing*'s narrow exception, SEI must show a preexisting "voluntary *(and thus presumably profitable)* course of dealing" with SS&C, and that the circumstances surrounding the termination of that relationship "suggest[ ] a willingness to forsake short-term profits to achieve an anticompetitive end." *Id* (emphasis in original). *See also Aerotec Int'l. v. Honeywell Int'l*, 836 F.3d 1171, 1182 (9th Cir. 2016) (citation omitted) ("Termination of a relationship is not actionable unless 'the only conceivable rationale or purpose' of it 'is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition.'").

In *Aspen Skiing*, the defendant's unilateral termination of a profitable course of dealing, even where the plaintiff offered to compensate the defendant at the same retail prices it charged skiers, "suggest[ed] a calculation that [the defendant's] future monopoly retail price would be

higher." *Id.* at 589-94; *Trinko*, 540 U.S. at 409. In other words, the defendant ski area's conduct was "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075; *see also* Areeda & Hovencamp, ANTITRUST LAW ¶ 772d3 (Supp. 2019) ("[B]efore a unilateral refusal to deal is unlawful under § 2, the refusal must be 'irrational' in the sense that the defendant sacrificed an opportunity to make a profitable sale only because of the adverse impact the refusal would have on a rival.")

SEI fails to allege facts resembling those of *Aspen Skiing* in any of the specifics identified by the Supreme Court in *Trinko* as significant. First, *Aspen Skiing*'s holding was driven by the Court's conclusion that the defendant had discontinued its prior, "presumably profitable" course of dealing "to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409; *see Aspen Skiing*, 472 U.S. at 610-11. Here, by contrast, SEI alleges that SS&C breached its contractual obligations in pursuit of profits it was unable to obtain because of the contractual terms limiting rate increases. *See* ECF No. ¶¶ 58–59, 75 (alleging that SS&C sought to accomplish growth by increasing prices "through our entire client base" in the outsourcing business where "we haven't in the past been as diligent."). This is hardly the unexplained, apparently irrational change in an established course of dealing found to be unlawful in *Aspen Skiing*.

Second, *Aspen Skiing* relied on the fact that the defendant ski area could use its significant market power to exclude its smaller rival. *See In re Adderall*, 754 F.3d at 134 (observing that *Aspen Skiing* held "that a business *with market power* may be subject to a duty to deal with a smaller competitor" (emphasis added)). In *Aspen Skiing*, the defendant ski area controlled three of four ski resorts in the area and could therefore harm its smaller competitor by selling a three-mountain ski pass to its own ski resorts while denying its smaller competitor access, even at retail price. *Aspen Skiing*, 472 U.S. at 610. Here, by contrast, SEI has not plausibly alleged that SS&C has a

significant presence in the market for outsourced portfolio accounting that consists, as alleged, of at least twenty competitors, thirty percent of which compete effectively without SS&C.

SS&C's conduct, as alleged, is consistent with the inference that SS&C was willing to end a contractual relationship that obliged it to license its software "under terms and conditions that [SEI found] commercially advantageous." *linkLine*, 555 U.S. at 450. The parties' contract limited SS&C's ability to increase its prices for what SEI alleges is a superior product, and SEI does not allege that SS&C refuses to sell its product to SEI on the same terms as to non-rivals. We find that SEI has not plausibly alleged that SS&C's alleged breach of the parties' operative agreement seeks to drive SEI from the market or discipline it for competing with SS&C, and therefore SEI's Second Amended Complaint does not plausibly allege circumstances invoking the refusal to deal doctrine.

### b. *Essential Facilities*

SEI also argues that SS&C's termination of the parties' operative agreement constitutes a denial of an essential facility in violation of Section 2. This antitrust doctrine is implicated "where a monopolist controls a facility that its competitors need access to if they are to compete effectively." *Monarch Entertainment Bureau, Inc. v. New Jersey Highway Auth.*, 715 F.Supp. 1290, 1300 (D.N.J.), *aff'd*, 893 F.2d 1331 (3d Cir.1989). The essential facilities doctrine is a "label that beguiles some commentators and courts into pronouncing a duty to deal without analyzing [its] implications." 3A Areeda & Hovenkamp, ANTITRUST LAW, ¶ 772a, at 175 (2d ed. 2002).

To establish the necessary elements, SEI must show "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir. 1996). As we have discussed, SEI has not pleaded facts showing that SS&C has market power in the relevant

18

market, much less that it is a monopolist. SS&C also has not plausibly alleged that SS&C's software is necessary for "competitive viability, i.e., competitors cannot effectively compete in the relevant market without it." *Colonial Penn Grp., Inc. v. Am. Ass'n of Retired Persons*, 698 F. Supp. 69, 73 (E.D. Pa. 1988).

SEI's claim fails for an obvious reason—a facility is only "essential" where it is otherwise unavailable. Per SEI's Second Amended Complaint, thirty percent of the top twenty providers of outsourced portfolio accounting services manage to compete using some software other than SS&C's. And, even if we were to accept SEI's allegations that SS&C's software is "facility that its competitors need access to if they are to compete effectively," SEI has not pleaded facts demonstrating an absolute denial of the use of SS&C's software to SEI or other competitors. *See MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983); *see also United Asset Coverage, Inc. v. Avaya Inc.*, 409 F.Supp.2d 1008, 1049 (N.D.Ill.2006) ("[T]he absolute refusal to deal that the essential facilities doctrine appears to contemplate is not present here."). SEI has alleged only that SS&C will no longer provide SEI access to its software at suboptimal prices. Thus, "[b]ecause reasonable access to the essential facility exists—even if not in a way that is conducive to [SEI]'s existing business model—[SEI] cannot establish an essential facilities claim." *Aerotec Int'l*, 836 F.3d at 1185.  SEI has not plausibly alleged that SEI's termination of the parties' Software License and Support Agreement was anticompetitive as a violation of the essential facilities doctrine. Accordingly, we will grant SS&C's motion to dismiss and do not reach SS&C's remaining arguments as to SEI's failure to plead the requisite elements of an attempted monopolization claim.

    **B.**    **Antitrust Standing–Antitrust Injury**

Even if SEI had pleaded a proper basis for its attempted monopolization claim, SEI's claim for attempted monopolization fails because it does not have antitrust standing. SEI alleges an injury, but not the type of injury the antitrust laws were intended to prevent.

"Competition is at the heart of the antitrust laws." *Philadelphia Taxi Ass'n, Inc.*, 886 F.3d at 338. The antitrust laws aim only to curtail anticompetitive conduct, "or a competition-reducing aspect or effect of the defendant's behavior." *Id*. Thus, as a threshold requirement, antitrust plaintiffs must establish antitrust injury. *See Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 501 (E.D. Pa. 2018) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat*, *Inc.*, 429 U.S. 477, 489 (1977)). Showing antitrust injury requires a plaintiff to plead that it suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant['s] acts unlawful." *Brunswick Corp.*, 429 U.S. at 489. "[SEI] must prove that the challenged conduct affected the prices, quantity or quality of goods and services, not just [its] own welfare." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) (quotations omitted). This requirement reflects the fundamental purpose of antitrust law: "to protect competition, not competitors." *Id*.

The injury required for antitrust standing must *flow from* the unlawful nature of defendants' acts. *See* Clayton Act, 15 U.S.C. § 15(a) (granting private right of action to anyone who has been injured "by reason of anything forbidden in the antitrust laws…") SEI attempts to cast SS&C's alleged terminations and license non-renewals as an unlawful refusal to deal with a rival and as an essential facilities doctrine violation of Section 2.[7]

As we discussed, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent

---

[7] *See* Phillip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 ANTITRUST L.J. 841, 841 (1990) (describing the doctrine as "less a doctrine than an epithet, indicating some exception to the right to keep one's creations to oneself, but not telling us what those exceptions are.").

discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408. It is well-settled that *Aspen Skiing*, "the leading case for § 2 liability based on refusal to cooperate with a rival," "is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409; *see also* Hovenkamp, Herbert, *Unilateral Refusals to Deal, Vertical Integration, and the Essential Facility Doctrine* (July 1, 2008). U Iowa Legal Studies Research Paper No. 08-31, https://ssrn.com/abstract=1144675 (noting the "idiosyncratic nature of the [essential] input at issue."). "As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]' " *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457 (2009)). "If [*Aspen Skiing*] stands for any principle that goes beyond its unusual facts, it is that a monopolist may be guilty of monopolization if it refuses to cooperate with a competitor in circumstances where some cooperation is indispensable to effective competition." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986), *cert. denied*, 480 U.S. 934 (1987).

SEI alleges that SS&C's termination of SEI's licenses to SS&C's software will permit SS&C to deny SEI access to its "mission-critical software" thereby harming SEI's business. ECF No. 24 at ¶ 173. SEI's injury, as alleged, flows from the termination of a longstanding contract with favorable terms to SEI that SS&C, having acquired Advent, sees as an arrangement that prevents it from "maximizing" profits for its superior product and is economically irrational. *See* ECF No. 24 at ¶ 58; *Novell*, 731 F.3d at 1075, 1077.

SS&C's decision to terminate SEI's perpetual licenses to obtain a price increase shows "[its] desire to maximize the company's immediate and overall profits." *Novell*, 731 F.3d at 1076. As SEI alleges in its Second Amended Complaint, "SS&C admitted that it was 'going through our entire client base … about prices increases and making sure that . . . we can maximize our

opportunity in our current client base…'" ECF No. 24 at ¶ 58. Taken together, SEI's allegations do not lead us conclude that SS&C's refusal to deal with its rival was "irrational but for its anticompetitive effect" and therefore an unlawful refusal to deal. *Novell*, 731 F.3d at 1075.

SEI's Second Amended Complaint makes clear that SS&C does not unlawfully deny SEI access to an essential facility that SEI must have to compete in the outsourced portfolio accounting services market. As we discussed, the essential facilities doctrine "imposes liability when [a monopolist], which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first." *Kerwin v. Casino*, 802 F. App' x 723, 727 (3d Cir. 2020) (citation omitted).

SEI pleaded that seventy percent of the top twenty outsourced portfolio accounting services providers use SS&C's software, "with certain of the remaining providers relying on proprietary platforms unavailable to SEI or other competitors." ECF No. 24 at ¶ 169. From this allegation, we could infer that "certain of the remaining [top twenty] providers" rely on a software that is neither SS&C's software, nor a proprietary platform. *See Tatis*, 882 F.3d at 426 (permitting courts to "accept as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them…"). Even if the full thirty percent of the arbitrarily defined top-twenty providers use their own proprietary software, SEI's allegation demonstrates that SS&C's software is not indispensable to competing in the outsourced portfolio accounting services market. *See Olympia Equip. Leasing Co.*, 797 F.2d at 379.

SEI's purported harm does not flow from SS&C's unlawful conduct under the antitrust laws. Not every business tort or breach of contract that has an adverse impact on a competitor can form the basis of an antitrust claim. *See Brooke Group Ltd.*, 509 U.S. at 226 ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the

federal antitrust laws; those laws do not create a federal law of unfair competition…"); *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir.1979) ("It is the impact upon competitive conditions in a definable product market which distinguishes the antitrust violation from the ordinary business tort.").

As SEI alleges, its business model rests on the favorable terms of the parties' contractual relationship. To compete not only with SS&C but with the thirty percent of the top twenty competitors in the relevant market who use non-SS&C software and all the competitors who also use SS&C's software, SEI needs access to SS&C's software under the parties' decades-old pricing terms. ECF No. 24 at ¶¶ 169–170. Each time the parties renewed SEI's licenses for SS&C's software, SEI thus made the business decision to continue to rely on its contract with SS&C to compete in the relevant market rather than developing a Plan B. It can be inferred from the factual allegations in the Second Amended Complaint that other competitors reached different business decisions and made investments to develop their own software or otherwise access portfolio accounting software without injuring their ability to compete. SEI's claims therefore "implicate principles of contract [but] are not the concern of the antitrust laws." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F.Supp. 1055, 1062 (E.D.Pa.1996), *aff'd*, 124 F.3d 430 (3d Cir. 1997).

As a final matter, SEI has not alleged any non-speculative negative impact on the outsourced portfolio accounting services consumers or to competition in general. *See Philadelphia Taxi Ass'n, Inc*, 886 F.3d 332 at 344. SEI equates the harm to its business were it to lose access to SS&C's software with decreased competition in the outsourced portfolio accounting services market. SEI alleges that SS&C intends to implement the same strategy it uses against SEI across its entire client base to force SS&C's other competitors in the relevant market to choose between paying "substantially higher costs and undercutting their competitiveness, or losing access to

23

essential software." ECF No. 24 at ¶ 173. Whether SS&C's competitors choose to pay higher cost for its software or forego SS&C's software for some other platform, SEI alleges that SS&C will increase its market share and market power over the relevant market. *Id*.

Crucially, though SEI alleges a potential detriment to consumers if SS&C "obtains complete control across the markets in which [it] competes," it has not pleaded any facts to suggest that such harm is an "imminent, realistic harm." *See id*. SEI alleged that even within the top twenty competitors in the relevant market, thirty per cent do not rely on SS&C's software at all. All SEI has shown is that it will be harmed as an individual competitor in the market by SS&C, which is not enough to confer standing under the Clayton Act. We find SEI lacks antitrust standing and will grant SS&C's motion to dismiss SEI's attempted monopolization claim.

### C.      Futility of Further Amendment

We find further amendment of Plaintiff's Second Amended Complaint to cure its failure to plead its attempted monopolization claim and antitrust injury would be futile and therefore will dismiss Count VI with prejudice. *See Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (determining that dismissal without leave to amend is justified where amendment would be futile). SEI first amended its complaint with leave of the Court on May 14, 2020. SS&C then moved to dismiss SEI's Amended Complaint on June 10, 2020. On June 23, 2020, with thirteen days to review Defendants' Motion to Dismiss, and without seeking leave of Court, SEI filed its Second Amended Complaint. SEI's Second Amended Complaint thus addresses the pleading deficiencies SS&C identified in its motion to dismiss. SEI's failure to plead facts plausibly stating an attempted monopolization claim on its third attempt tells us that further amendment would be futile. SEI has not set forth any reason for us to believe that further amendment of its complaint will cure the deficiencies we have identified. *Phillips*, 515 F.3d at 245 (3d Cir. 2008).

## IV.     SUPPLEMENTAL JURISDICTION

"A district court can decline to exercise supplemental jurisdiction in several circumstances, including a situation where 'the district court has dismissed all claims over which it has original jurisdiction,' as in this case." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 135 (3d Cir.2013) (quoting 28 U.S.C. § 1367(c)(3)). Having found that SEI failed to assert a cognizable antitrust claim, we decline to exercise supplemental jurisdiction over SEI's state law claims because there is neither diversity among the parties nor any special circumstances justifying our exercise of supplemental diversity. We will accordingly dismiss Counts I, III, IV, V, VII, and VIII without prejudice for want of jurisdiction. Finally, SEI brought a claim (Count II) under the Declaratory Judgment Act, 28 U.S.C. § 2201, which only provides a means of relief, and does not itself confer jurisdiction. *Queen City Pizza, Inc.*, 922 F. Supp. at 1063. We will dismiss Count II for want of jurisdiction.

## V.     CONCLUSION

For the foregoing reasons, we will dismiss Plaintiff's Second Amended Complaint Count VI with prejudice and will dismiss Plaintiff's remaining claims without prejudice for want of jurisdiction. An appropriate order follows.